**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 21-cr-601 (JDB)** |
| | : | |
| **DAVID ANTONIO TICAS,** | : | |
| | : | |
| **Defendant.** | : | |

## <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence David Antonio Ticas to three months' incarceration, 36 months' probation, 60 hours community service, and $500 restitution.

### I.     Introduction

The defendant, a former Staff Sergeant (E-6) in the U.S. Marine Corps, brought his then sixteen-year-old daughter with him into the United States Capitol while he participated in the January 6, 2021 attack on the Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars' in losses.[1]

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

On April 26, 2022, Ticas pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): parading, demonstrating, or picketing in the Capitol Building. As explained herein, a sentence of three months' imprisonment, 36 months' probation, 60 hours community service, and restitution of $500, is appropriate in this case because Ticas: (1)  brought his sixteen-year-old daughter inside the Capitol Building on January 6, even after witnessing police officers firing non-lethal munitions against the mob of rioters; (2) entered the Capitol through the Senate Wing Door while filming other rioters entering through smashed out windows right next to that door; (3) moved extensively throughout the  Capitol Building with his daughter at his side;  (4) incited his fellow rioters by shouting that the police could not scare them by setting off the non-lethal munitions; (5) mocked and harassed police officers who were guarding the Capitol that day, and asked them to reveal the location of lawmakers who might be hiding from the mob inside the Capitol; (6) after leaving the Capitol on January 6, repeatedly expressed pride and satisfaction in his participation in the riot, going so far as to call himself a "domestic terrorist"; (7) refused to provide any financial information to the Probation Office, showing disregard for the sentencing process; (8) has expressed no remorse for his crimes even to this day; and (9) as a former United States Marine veteran, was acutely aware of the dangers that his and other rioters' presence at the Capitol posed to police officers and Members of Congress that day.

The Court must also consider that Ticas's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed to disrupt the certification vote. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they

had the safety of numbers.") (statement of Judge Chutkan). Here, Ticas's participation in a riot that actually succeeded in halting the Congressional certification combined with Ticas's preparation for violence, his celebration and endorsement of the violence on that day, his lack of remorse, and the potential for future violence renders a significant jail sentence both necessary and appropriate in this case.

## II.    Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 30 (Statement of Offense), at 1-3. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Ticas's conduct and behavior on January 6.

### *Ticas's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Ticas traveled with his family to Washington, D.C., from their home in Georgia to attend the "Stop the Steal" rally. *See id.* ¶¶ 8-9. After the rally, Ticas and his family, including his then sixteen-year-old daughter walked to the U.S. Capitol. At about 1:41 p.m., Ticas was on restricted grounds, as part of the mob that had gathered near the northwest staircase next to the Lower West Terrace at the U.S. Capitol Building. *Id.* ¶ 10.

While there, Ticas recorded several videos, which were recovered by law enforcement from Ticas's cell phone.  In one of the videos, Ticas can be heard shouting, "Look at these f***ing pussies.  Motherf***ers," as he zooms in the camera and records a line of officers blocking rioters from ascending the northwest staircase. Exhibit 1. "That s*** don't scare us, motherf***ers,"

Ticas shouted as loud flashbangs erupted in the background. *Id*. A screenshot of the video is provided as Exhibit 2, *below*:



*Image 1*

At the end of the video, Ticas surveys the crowd gathered by the Lower West Terrace and records himself giving a thumbs up. A screenshot is provided as Image 2, *below*:



*Image 2*

Ticas and his daughter then moved closer to the Capitol and the police officers protecting the building. In another video, Ticas zoomed in on officers who are pepper spraying rioters on the northwest staircase and said, "Oh they're bringing that pepper spray.  Okay Ironman. Let's go! Booooo!"  Exhibit 2. A screenshot from the video is provided as Image 3, *below*:



*Image 3*

Next, Ticas and his daughter scaled a metal bike rack barricade that was positioned against the retaining wall of the northwest staircase to climb up on the staircase.  Ticas and his daughter then ascended the northwest staircase with a mob of protestors and began walking toward the Senate Wing Door. Exhibit 3.

When he approached the U.S. Capitol building, Ticas encountered several U.S. Capitol Police Officers dressed in black riot gear blocking entry to the Senate Parliamentarian's Door. Exhibit 7. A screenshot from this video is provided as Image 4, *below*:



*Image 4*

Ticas recorded a video of these officers, and in the video, can be heard repeatedly shouting, "Where's Chuck Schumer?" at the officers. Exhibit 7. Later in the video, as Ticas began to ascend the ramp toward the Senate Wing Door, he said to his daughter, "Let's go in for a tour and come out." *Id.*

Ticas and his daughter followed a group of rioters up toward a broken window next to the Senate Wing door, where he recorded rioters entering through the broken window. *Id.* A screenshot of the video is provided as Image 5, *below*:



*Image 5*

Ticas and his daughter entered the U.S. Capitol Building through the Senate Wing Door at approximately 2:23 p.m.   Ticas recorded videos on his cell phone to document his entry and passage through the U.S. Capitol Building. Exhibit 4. As he passed through the Senate Wing door, audible alarms could be heard blaring and there were no officers posted at the entry as he and his daughter passed through it. *Id*.

Upon entering the U.S. Capitol Building, Ticas walked north through a hallway, where he encountered several law enforcement officers.  In a video recording of this incident, Ticas can be heard chanting "Stop the steal! Stop the steal!" and asking a male officer, "Where's Nancy Pelosi? You have no idea?" as the officer shakes his head. *Id*. Ticas then asked the officer, "Are they using the tunnels?" to which the officer replied, "They're not here." *Id*. Ticas then said, "Not here?  Y'all snuck away through the tunnels." *Id*. Ticas then turned around and walked back past the Senate

Wing Door lobby, where he witnessed other rioters climbing through a broken window.  In a recording of this incident, Ticas can be heard saying, "Woo! The F***ing s***'s wild!", "Damn. Vandalizing s***", "Let's go!", and chanting "U S A …" while moving through the U.S. Capitol halls with a mob of protestors. *Id.*

Ticas and his daughter entered the Crypt at approximately 2:25 p.m.  Screenshots of U.S. Capitol surveillance footage of Ticas and his underage daughter are provided as Images 6 and 7, *below*:



*Image 6*



*Image 7*

Inside the Crypt, Ticas recorded a video of himself flashing a thumbs up sign and chanting "Our House" with a mob of rioters. Exhibit 4. Ticas was later offered a cigarette by another rioter in the Crypt, which he proceeded to smoke inside the Crypt. *Id*. Ticas also took a photograph next to a statute inside the Crypt, which he posted to his Instagram profile, which is provided in Image 8, *below*:



*Image 8*

Ticas and his daughter exited the Crypt at approximately 2:42 p.m. and continued walking south toward the Hall of Columns.  As Ticas approached the doors to exit, he shouted, "You guys are on the wrong f***ing side.  You wouldn't be doing this.  F***ing crooks."  Exhibit 5. Ticas and his daughter ultimately exited the  Capitol at 2:44 p.m. through the South Doors.  Upon exiting the Capitol, Ticas yelled "Don't f***ing touch me" at a Metropolitan Police Department officer. *Id*. After exiting the building, Ticas walked toward the East Front of the Capitol, where he recorded himself saying, "S*** was wild."   Ticas spent approximately 19 minutes inside the U.S. Capitol Building.

*Ticas's Text Messages Following January 6, 2021*

In the evening following the riot, Ticas texted two friends, "We stormed the f[******] Capital building!" and attached pictures from both inside and outside the U.S. Capitol Building. That night, Ticas also texted the same two friends, "Someone gave me a cig so I smoke one inside capital building." On January 7, 2021, Ticas texted a friend, "If I disrupted the vote, good. As far as looting and vandalizing, we did not do that. F[***] these corrupt politicians," and "We'll see what happens. I could care less if the capital building went up in flames, serves only the interest of globalist and anti-american clowns." On January 7, 2021, Ticas texted another friend, "The door to the capital building was opened, cops were only blocking one entrance. Inside the cops were walking around only blocking certain entrances." On April 29, 2021, Ticas texted a contact in his phone, "I'm a f[******] domestic terrorist aka Patriot. I don't give a f[***]."

*Ticas' Post-Arrest Interview*

Ticas voluntarily agreed to an interview with the FBI at the time of his arrest. During the interview, Ticas expressed no remorse for his conduct on January 6, but rather attempted to justify it. He stated, "Everybody was just pissed off because they know the election was stolen. That's the reason people were there." He admitted to entering the Capitol Building on January 6 but downplayed his actions. He stated that the Capitol Police "let him in" to the building, and that he did not do anything violent, destructive, or illegal. He stated, "The police were standing right there. They weren't stopping anyone." When asked if he witnessed any instigators in the crowd, Ticas responded, "Not really."

*The Charges and Plea Agreement*

On September 21, 2021, Ticas was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) & (2) and 40 U.S.C. §§ 5104(e)(2)(D) & (G). On September 23, 2021, he was

11

arrested in California. On September 27, 2021, Ticas was charged by four-count Information with the same four charges. On April 26, 2022, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), parading, demonstrating, or picketing in a capitol building. By plea agreement, Ticas agreed to pay $500 in restitution to the Department of the Treasury. Ticas refused to provide any financial information to the Probation Office. *See* PSR ¶¶ 69, 72.

### III.    Statutory Penalties

Ticas now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Ticas faces up to six months of imprisonment and a fine of up to $5,000. Ticas must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration.

**A.  The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, the Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at Ticas's individual conduct, this Court should look to a number of critical aggravating and mitigating factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

13

To be clear, had Ticas personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on his part is therefore not a mitigating factor in this misdemeanor case, nor does it meaningfully distinguish him from most other misdemeanor defendants.

When Ticas approached the U.S. Capitol building on January 6, 2021, Ticas knew that police were actively trying to keep protestors out of the building. He took videos of officers protecting the entrances, deploying flash-bangs to disperse the crowd, and protestors being sprayed with pepper spray. Ticas actively berated the officers for protecting the Capitol, calling them derogatory names. All of this conduct occurred in the presence of his then sixteen-year-old daughter.

As an U.S. Marine Corps veteran, Ticas was well aware of the great jeopardy posed by violent entry into the U.S. Capitol by the rioters. Ticas incited and celebrated the mob that broke through the police line and into the building. While standing next to his daughter with flash-bangs going off nearby, Ticas can be heard shouting, "Look at these f***ing pussies. Motherf***ers," and "That s*** don't scare us, motherf***ers." Exhibit 1. Upon leaving the U.S. Capitol building Ticas can be heard berating officers and yelling "Don't f***ing touch me" at a Metropolitan Police Department officer. Exhibit 5.

Ticas's text messages following the events show he was proud of his actions on January 6, 2021. Following the riot, he texted two friends, "We stormed the f[******] Capital building!" and attached pictures from both inside and outside the U.S. Capitol Building. That night, Ticas also texted the same two friends, "Someone gave me a cig so I smoke one inside capital building." On January 7, 2021, Ticas texted a friend, "If I disrupted the vote, good. As far as looting and vandalizing, we did not do that. F[***] these corrupt politicians," and "We'll see what happens. I

could care less if the capital building went up in flames, serves only the interest of globalist and anti-american clowns." On April 29, 2021, Ticas texted a contact in his phone, "I'm a f[******] domestic terrorist aka Patriot.  I don't give a f[***]."

Ticas's post-arrest interview also indicates a lack of remorse. He told the FBI that he was let into the building by police when the videos he recorded during the events show the exact opposite. Ticas entered the through the Senate Wing door shortly after it was breached. While no police officers blocked his path, there were clear signs of violent entry. The window adjacent to the door through which Ticas passed had just been smashed out, and Ticas watched as rioters entered through the broken window. Ticas heard the alarm sounding at the entrance, as captured in Exhibit 4. Ticas was aware that tear gas and flashbangs were being deployed to prevent entry into the building.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  Ticas' History and Characteristics

As set forth in the PSR, Ticas's criminal history consists of a couple of arrests in 2009 with no convictions. ECF 32 ¶¶ 39-40. He reported to probation that he enlisted in the U.S. Marines in September 2000 and was medically discharged in 2015. *Id*. ¶ 65. Ticas advised probation that while with the U.S. Marines, he achieved a rank of E-6 and was awarded several service-related honors. *Id*. At the time of his arrest in this case, Ticas was a full-time student. *Id*. ¶ 66. He does construction and handyman jobs to help support his family while pursuing his bachelor's degree.

While Ticas's military service is laudable, it renders his conduct on January 6, 2021, all the more troubling. As a former military member, Ticas was well aware that violent takeover of U.S. government buildings by a mob was not an acceptable way to protest the result of an election.

His voluntary decision to storm a guarded government building with his daughter by his side is nothing short of shocking in light of his former military service and training.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[2] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most

---

[2] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters— especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Ticas's words, post-arrest interview, and statements to friends in text messages and on social media clearly demonstrate the need for specific deterrence for this defendant. Ticas berated law enforcement officers as he exited the U.S. Capitol, Exhibit 5, and celebrated the violence of the day after January 6 by posting Image 8, *above*, an Instagram post of himself illegally in the Crypt to the U.S. Capitol. After the attack, Ticas repeatedly bragged in text messaging about storming and smoking a cigarette inside the Capitol building. He was seemingly proud to disrupt the vote and stated he would not care if the U.S. Capitol "went up in flames" or that he may be considered a domestic terrorist for his actions. During the sentencing process, Ticas refused to provide any financial information to the Probation Office, showing disregard for the sentencing process (*see* PSR ¶¶ 69, 72).

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[3] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A

---

[3] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

probationary sentence should not necessarily become the default.[4] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have drawn meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Ticas has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This

---

[4] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.   And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants

were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may consider for reference the sentence imposed on Virginia Spencer. Like Ticas, Spencer brought her 14-year-old child into the Capitol during the riot; entered through the Senate Wing Door close to the time of the initial breach; was verbally abusive to law enforcement officers; and minimized her conduct during her post-arrest interview with the FBI. *See* 1:21-cr-00147-002-CKK, Dkt. No 55. Spencer plead guilty to the same charge as Ticas, and the Court imposed the sentencing recommendation of the United States for jail time of three months for Spencer (*see id*., Dkt. 72), which is the same jail time recommended here for Ticas.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense.  *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. April 22, 2022) (imposing split sentence); *United States v. Sarko*, 21-cr-591 (CKK), ECF 37 (D.D.C. April 29, 2022) (imposing split sentence); *United States v. Entrekin*, 21-cr-686 (FYP), ECF 34 (D.D.C. May 6, 2022) (imposing split sentence); *United States v. Hemphill*, 21-cr-555(RCL), ECF 42 (D.D.C. May 24, 2022) (imposing split sentence); *United States v. Buhler*, 21-cr-510(CKK), ECF 39 (D.D.C. June 1, 2022) (imposing split sentence); *United States v. Caplinger*, 21-cr-342(PLF), ECF 65 (D.D.C. June 7, 2022) (opinion concluding that split sentence is permissible). In addition, for any defendant placed on probation, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

### A.  A sentence imposed for a petty offense may include both incarceration and probation.

#### 1.  *Relevant Background*

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today.  *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing).  That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter

227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment).   Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[5] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences."  Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided."  18 U.S.C. § 3551(a).  Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[6] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment."  *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation."  As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense."  Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D.

---

[5] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3563(b)(10).  *See* Part II *infra*.

[6] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence."  18 U.S.C. § 3551(b).

Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3).  In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense."  H.R. Rep. 102-405, at 167 (1991).  Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language.  *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report).  In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

### 2.  *Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases.  *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).  In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404,

at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."  *Little*, 2022 WL 768685, at *4.  But that limitation "does not extend" to a defendant sentenced to a petty offense. *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation.  *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam).  In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison.  *Id.* at 808.  In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3)

"[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense"). Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL

26

768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart

from a case involving a petty offense. *Id.* This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two

offenses, at least one of which is a petty offense.  For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough.  *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted).  Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation).  Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation).  No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.  The defendant pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine.  *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

### B.  A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.

#### 1.  *Relevant background*

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563.
Among the discretionary conditions of probation a sentencing court may impose is a requirement

that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*[7]

### A.  Analysis

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time."  18 U.S.C. § 3563(b)(10).  Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix

---

[7] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[8]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In any event, the government does not advocate a sentence that includes a imprisonment as a term of probation in the defendant's case given the requested three month imprisonment sentence.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence David Ticas to three months' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and

---

[8] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while

recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar Number 481052

By:   */s/ Andrew J. Tessman*
ANDREW J. TESSMAN
Assistant United States Attorney
Federal Major Crimes – Detailee
West Virginia Bar No. 13734
300 Virginia Street
Charleston, WV 25301
(304) 345-2200
Andrew.Tessman@usdoj.gov